## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GATEWAY FUNDING | : | CIVIL ACTION |
| DIVERSIFIED MORTGAGE | : | |
| SERVICES, L.P., et al., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 04-4428 |
| | : | |
| JOHN FIELD and | : | |
| MARTY WITZBURG. | : | |
| Defendants. | : | |

### M E M O R A N D U M

**STENGEL, J.**                                                                 **July 10, 2008**

This case involves an arbitration award dispute.  The petitioners have brought a motion to confirm arbitration pursuant to Section 9 of the Federal Arbitration Act (FAA), 9 U.S.C. § 9.  The respondents are asking the court to vacate, modify or correct the award claiming that Gateway withheld material documents and that personal liability against a loan officer is in express violation of Department of Housing and Urban Development (HUD) rules.  Upon reviewing the voluminous record in this case, the arbitrator's ruling was fair and appropriate.  For the reasons discussed below, I will confirm the arbitrator's award.

## I.   BACKGROUND

This case originated as a dispute between John Field and Marty Witzburg against Gateway Funding Diversified Mortgage Services, L.P., Regina M. Lowrie, Paul C. Catinella and Michael Karp.  Gateway subsequently filed counterclaims against Field and

Witzburg.  This matter was administered by the American Arbitration Association (AAA) pursuant to Field and Witzburg's employment agreements.  Margaret R. Brogan, Esq. served as the arbitrator pursuant to the AAA National Rules for Resolution of Employment Disputes.

Arbitration hearings were held on January 23, 26, 27, 2006, February 1, 3,  2006, March 13, 2006, May 5, 2006 and June 20, 2007 at the AAA offices in Philadelphia, Pennsylvania.  On November 1, 2006 the arbitrator issued an Interim Award, where the arbitrator made relevant determinations as to liability, and retained jurisdiction over the matter with regards to the remedy phase.  On June 20, 2007, the parties conducted a one day hearing to address damages.  On August 22, 2007, the arbitrator issued her Final Award, and determined that the respondents must pay the petitioners a total of $1,315,330.00 in damages.

The original dispute in this matter focused on agreements entered into by Field and Witzburg with Gateway.  On March 6, 2000, Field and Witzburg entered into identical Branch Manager employment agreements, as well as entered into a separate Net Branch Agreement, setting forth certain conditions with respect to loan pricing and a "protected territory."  Claimants also entered into an Addendum on August 20, 2002, which dealt with loan activity in the protected territory.

Field and Witzburg filed two claims against Gateway.  These claims were adjudicated at arbitration.  First, Field and Witzburg claimed that Gateway shortchanged

them in the amount of monies due under the "loan pricing provision" of the Net Branch

Agreement.  Second, they claimed that Gateway breached the protected territories

provision of the contracts by acquiring another mortgage firm, Ivy Mortgage, employing

former Ivy loan officers who closed loans within the protected territories, and by failing

to pay Field and Witzburg the 37.5 basis points allegedly promised for loans closed

within the protected territories by former Ivy loan officers or others employed by

Gateway.  Claimants alleged that this conduct rose to the level of breach of contract,

common law fraud, negligent misrepresentation, violation of the federal RICO statute or

state RICO statutes and/or constructive discharge.  Claimants were seeking compensatory

damages in the amount of .375% for all Ivy loan originations for a period of five years;

compensatory damages in the amount of .375% for all non-Ivy loan originations by

Gateway that took place within the protected territories; compensatory damages in the

amount of $1,525,259 for the alleged breach of the loan pricing provision of the Net

Branch Agreement; civil monetary penalties pursuant to 18 U.S.C. § 1962 trebling the

compensatory damages owed for breach of the loan pricing provision; an award of

reasonable attorneys' fees and costs; an award of punitive damages trebling the

compensatory damages owed due to the loan pricing violation; and dismissal with

prejudice of petitioners' counterclaims.

 Petitioners counterclaimed that the respondents owed monies advanced to them,

but not earned, prior to the Claimant's alleged breach of their employment agreements

and voluntary resignations from Gateway.  These monies totaled $808,137.00 on the net

branch's last profit and loss (P&L) statement prior to their separation from Gateway.

Petitioners further allege that the respondents are liable for the breach of their

employment agreements by providing confidential Gateway information and diverting

prospective customers from Gateway to a competitor.

The arbitral litigation of this matter entailed 1861 pages of transcript, voluminous

documents, extensive interim briefing by the parties, post-hearing submissions totaling

over 1000 pages as well as numerous accompanying exhibits.  After the seventh day of

the hearing, the parties agreed to close the record by stipulation on June 20, 2006.

Arbitrator Brogan issued an Interim Award[1] on November 1, 2006 as to the liability phase

---

[1] I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the employment agreements entered into by the above-named parties, and having been duly sworn and having duly heard the proofs and allegations of the parties, AWARD as follows:

**1)** Claimants failed to prove that Respondents engaged in breach of contract, common law fraud, civil conspiracy to commit fraud, and/or violations of federal and/or state RICO statutes based upon the Claimants' allegations with respect to the loan pricing provision of the Net Branch Agreement.

**2)** Claimants proved that Respondent Gateway engaged in a contract breach when it violated paragraph 4 of the August 20, 2002 Addendum by failing to pay the 37.5 basis point override for loans closed by former Ivy loan officers within the protected territories during the months of March, April and May 2004, plus interest at the legal rate.  This relief is limited to loans closed relating to real estate properties located within the protected territories, as the protected territories are defined under the Net Branch Agreement and Addendum.  The claims upheld pursuant to this section are limited to the entity Gateway; claims against Lowrie and Catinella as individuals are dismissed.  As to the appropriate liability for this specific breach, I find that the record is unclear as to the extent of the damage incurred by the Claimants.

**3)** Respondents proved that Claimants are liable, under paragraph 6 of the August 20, 2002 Addendum, for the negative deficit reflected in the Morristown net branch P&L.  In remedy for this breach, the Claimants must pay to Respondents the amount of $808,137, plus interest at the legal rate.

**4)** Respondents proved that Claimants engaged in violations of the employment agreements, including the duty of loyalty under Article 2.2, the duty of confidentiality under Article 5.1, the duty to preserve Gateway's exclusive rights to customer lists and referral sources under Article

of the proceeding and issued her Final Award[2] on August 22, 2006 in favor of the

respondents.

The respondents are now seeking to vacate, modify or correct the arbitration

award.  They claim that the arbitrator, Ms. Brogan, did not interpret the contract or

determine whether it was implemented in accordance with its terms.  They believe that

Ms. Brogan incorrectly found that the contract was implemented by Sicilia entirely on her

---

5.2.  As to the appropriate remedy for these breaches, I find that the record is unclear as to the extent of the damage incurred by Respondents.

**5)** I shall retain jurisdiction with respect to the liability owed under paragraphs 2 and 4 above, and with respect to the interest owed in paragraph 3 above.  I hereby order the parties to confer with respect to potential settlement of the remedy and interest issues in the next thirty days from the date of this Award.  In the event that the parties cannot reach agreement as to the appropriate remedy owed Respondents by the Claimants within that thirty day period, they shall so immediately inform the AAA administrator.  The parties will then provide written submissions as to their respective positions with regard to remedy, in accordance with a briefing schedule set by the undersigned arbitrator.  Upon receipt of said submissions, I will determine a procedure for the determination of the appropriate remedy, which may include additional days of hearing.

**6)** In line with my ruling March 12, 2006, all claims against Michael Karp are denied.

[2] I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the employment agreements entered into buy the above-named parties, and having been duly sworn and having duly heard the proofs and allegations of the parties, AWARD as follows:

**1)** For the found liability under paragraph 2 of the Interim Award, Respondents shall pay to Claimants the sum of Three Hundred Seventeen Thousand, Three Hundred Sixty Four Dollars ($317,364).

**2)** For the found liability under paragraph 3 of the Interim Award, Claimants shall pay to Respondents the sum of Nine Hundred Thirty Seven Thousand, Four Hundred Forty Nine Dollars ($937,449).

**3)** For the found liability under paragraph 4 of the Interim Award, Claimants shall pay to Respondents the sum of Six Hundred Ninety Five Thousand, Two Hundred Forty Five Dollars ($695,045).

The administrative fees of the American Arbitration Association totaling $28,000 and the arbitrator's compensation totaling 65,025.00 shall be borne as incurred.

The Award is in full settlement of all claims submitted to the Arbitration.  All claims not expressly granted herein are, hereby, denied.

own "with no credible proof that [senior management gave] any instructions to Sicilia as to how to implement the loan pricing provision and no credible proof that they were specifically aware as to how Sicilia performed this duty." (Interim Award at 37-38).  In support of their contention, respondents contend that there were secretly withheld documents that showed that senior management was fully informed about the implementation of the loan pricing provision, were fully aware of how Sicilia performed her duty, and intentionally over-charged on the Morristown[3] loans.

Respondents claim that since this information was withheld by Gateway, they were unable to cross-examine Gateway witnesses on the issue and these witnesses testified contrary to the information stated in the withheld documents.  It was not until after the hearing concluded that Ms. Brogan allowed a document subpoena to be served on Mr. Orzechowicz, a former Gateway executive, who had retained a small set of monthly meeting reports in a box in his garage.  Respondents claim that these documents showed that Sicilia discussed loan pricing to the Morristown Branch with senior management at monthly meetings and that senior management approved excess, improper pricing of the Morristown loans.  These documents are believed to confirm that the additional margin charged on government loans originated by the Morristown branch was intentional and not the result of a "mistake" as claimed by Sicilia.

---

[3] Field and Witzburg were hired to run the Gateway branch in Morristown, N.J. by Gateway senior executive Mike Orzechowicz and President and CEO Regina Lowrie.

Respondents discovery requests[4] specifically sought information about how Gateway implemented the loan pricing provision of the Branch Office Agreement and who in senior management knew about the pricing of loans to the Morristown Branch. Gateway asserted that it would produce the requested information "if any such information existed."  Respondents contend that the withheld documents fell squarely within their document request and should have been produced before the arbitration.

The documents eventually produced by Mr. Orzechowicz were Document MO 02, an agenda for the March 27, 2001 meeting with senior management, that included a section labeled "Market Overview/Pricing."  The meeting materials for the March 27, 2001 meeting contained MO 05, a report which has a corresponding section on page 3 called "Market Overview/Pricing" that includes MO 08, a page with one section called "Market Overview" and another called "Pricing."  Under the "Pricing" section, margins are disclosed for Retail, Net Branch and specifically, Field/Witzburg.  The standard margin for Gateway Funding Diversified Net Branch is one point.  For Field and Witzburg the margin on conventionals is .50 and for jumbos .375 as defined in the Branch Office Agreement.  However, the report indicates that Field and Witzburg were being charged an additional .375 on government loans.  This fact was also disclosed on MO 24, the January 30, 2001 meeting, and in MO 32, the April 24, 2001 meeting.  Respondents

---

[4] Document Request No. 2 sought all documents evidencing "the amount of income or loss contributed to Gateway by the Net Branch and attributable to ... Closed Loans" as well as any and all reports that "were created for and/or reviewed at board meetings or executive meetings of Gateway."

contend that this shows that Gateway was knowingly over-charging Field and Witzburg .875 on the government loans and that these documents contradict Gateway's position that no one knew about the overcharge and that it was a mistake.

Mr. Orzechowicz was subpoenaed to testify and by agreement was to appear to testify at the hearing.  The morning before the hearing, Mr. Orzechowicz called counsel and advised them that he would not be able to attend the hearing due to a death in his family.  At that time, Mr. Orzechowicz informed counsel that he would appear and give testimony at the next hearing on March 13, 2006. On March 13, 2006, Mr. Orzechowicz did not appear because the subpoena had not been properly served; so Ms. Brogan re-issued the testimony subpoena.  Finally, on the last day of the hearing, Mr. Orzechowicz testified that there were monthly board materials and executive committee materials that discussed the pricing of loans and margin to the Morristown Branch.  Respondents suggest that these documents were secretly withheld material documents that were relevant to key issues in the case and that such conduct should result in a vacatur.

Petitioners believe that there is no basis to vacate the arbitration award and that both parties received a fair trial.  They contend that respondent's objections are specious and against both the weight of the evidence and the arbitrator's thorough interpretation and analysis of the facts.  Petitioners claim that respondents never issued discovery requests for the board meeting documents, and chose not to take depositions or cross examine Gateway employees about the possible existence of such documents.  Petitioners

maintain that the arbitrator properly found the meeting documents to be irrelevant.

Petitioners believe that both parties received a fair trail. Ms. Brogan allowed both parties all the time that they needed to present their case and even permitted the respondents to continue through their allotted time. Subsequently, both parties submitted hundreds of pages of briefs and reply briefs. After considering all the evidence, including the evidence regarding the withheld documents, the arbitrator issued a well-reasoned 53-page Interim Opinion and Award followed by a 15-page Final Opinion and Award.

Respondents argument that Gateway withheld board meeting documents was argued during the arbitration hearing. After Mr. Orzechowicz produced copies of the board meeting documents, respondents sent the arbitrator a 10-page letter accusing Gateway of withholding these documents. Gateway responded with a 27-page letter detailing why the allegations were unfounded. Respondents then devoted the first 12 pages of their post-hearing brief seeking an adverse inference. The arbitrator, who had been deeply involved in overseeing the discovery process, fully considered both parties arguments and determined that Gateway had not committed a discovery violation.

Furthermore, petitioners submit that respondents' met with Mr. Orzechowicz and reviewed these documents several weeks before the arbitration began. However, respondents never asked about these documents or sought a copy of them. Mr. Orzechowicz submitted two sworn Affidavits stating that he had shown respondent's counsel these documents at their January 2006 meeting. In fact, petitioners contend that

Mr. Orzechowicz answered several of counsel's questions on direct examination[5] by referring to the documents that he had shown them at the January meeting.  Thus, petitioners conclude that the arbitrator's determination that they did not commit any discovery violations was well-founded and provides no basis for vacatur under the FAA.

Petitioners next claim that respondents had a fair opportunity to cross-examine Gateway's witnesses with the meeting documents.  In fact, petitioners claim that the respondents did ask Gateway's witnesses about the board meeting documents on cross-examination, and even then, when Gateway's witnesses testified that documents were distributed at monthly meetings, respondents never asked Gateway to produce those documents.  After Mr. Orzechowicz produced his set of board meeting documents, the arbitrator specifically advised the parties that she would reopen the record for testimony for good cause shown.  Respondents did not seek to reopen the record to cross-examine

---

[5] Q. You were asked by Mr. Hoffman if at the time you were with - at some time had you ever heard that Gateway was taking more than its 50 basis points.  Did you ever learn at any time that Gateway was taking more than 50 basis points.

A. *On that sheet that I showed you*, I think you saw government loans on there at three-quarters. The margin appeared to be higher than what was on the agreements.

Q. Did anyone ask you at that time if you had any documents?

A. No.  I wasn't asked, I offered.

Q. You offered that you had them?

A. I offered that I had shown you documents.

Q. They had asked me the same question earlier, do I still have them and I said I'm not sure; but my counsel did advise me not to destroy it, so it's not destroyed.  It's just I'd have to look for it.

Gateway's witnesses with the meeting documents.  Instead they stipulated to end the arbitration, close the record, accuse Gateway of discovery violations, claim prejudice and argue for an adverse inference.  Respondents had the opportunity to cross-examine any of Gateway's witnesses regarding the board meeting, but chose to close the record instead. Now, that there strategy has failed they are seeking to find another way to present this evidence after the fact.

Next, petitioners claim that the board meeting documents are largely irrelevant and, at best, cumulative of other documents produced by Gateway in discovery.  The pages that Mr. Orzechowicz produced relating to respondent's branch office merely restated the same loan margin information reflected in the electronic loan database that Gateway turned over in discovery eight months earlier.  Petitioners contend that the arbitrator fairly and thoroughly reviewed the meeting documents and concluded that they were irrelevant and did not prove or clarify anything in this case.  The arbitrator stated that these documents supported Gateway's explanation of the parties' course of conduct during the contract period and that they did not demonstrate fraud or any other violations in her Interim Opinion.[6]  The arbitrator reviewed and carefully considered the meeting documents and found them to be inconsequential.

---

[6] These references are far from a smoking gun as alleged by [respondents].  The Market Overview merely reinforces the course of conduct described above, in which the parties engaged to implement the Net Branch Agreement, with the full knowledge and participation of the [responsdents]... Even if such a document was given out at every single Board meeting, this meager evidence simply does not demonstrate fraud or a conspiracy to defraud the [respondents], as alleged, nor does it prove a violation of either state or federal racketeering statutes.  (Interim Opinion pp. 40-41).

Respondents maintain that there are other grounds to vacate the arbitrator's award. First, they contend that Ms. Brogan's disparate treatment of the parties shows that she was an impartial arbitrator.  Respondents claim that Ms. Brogan incorrectly imposed a sweeping adverse inference against them for allegedly destroying documents.  Petitioners alleged that while in the employment of Gateway, Witzburg and Field diverted loans to their new employer, Charter.  Ms. Brogan made the inference that the respondents destroyed the relevant evidence to hide their activity.  She concluded that since Mr. Witzburg had his personal laptop computer reformatted, Mr. Field had very few messages on his Blackberry and there was a decrease in loan production of the Morristown Branch, the respondents had destroyed the relevant evidence of their loan diversion scheme.  Ms. Brogan made the respondents liable for a loan volume for Gateway that was equal to the loan volume they generated during 2004.

Next, respondents claim that, according to the Branch Manager Agreement, their compensation is clear and unambiguous.  They claim that Ms. Brogan was incorrect and that they did not have a post-employment obligation to repay Gateway on the alleged P&L deficiencies in their branch.  Pursuant to the Net Branch Agreement, the parties agreed that in the event that Gateway intends to make a "repayable advance" to Field and Witzburg it must be in writing and on a specific form.  The contract then provides that if advances made pursuant to the signed note are not repaid at the termination of employment they become accelerated and due immediately.  Respondents contend that in

situations where a signed note was not executed they cannot be held liable for such advances; but rather, Gateway's sole option was to hold "Additional Compensation" in reserve for possible future losses or expenses. Thus, Ms. Brogan did not follow the clear and unambiguous agreement by forcing respondents to re-pay the alleged unsigned P&L deficiencies.

Petitioners claim that this argument was already submitted to the arbitrator and denied. There was no evidence that the parties ever executed advance notes, and the parties' course of conduct was the best evidence of how the contract should be interpreted. Gateway permitted the respondents to take monthly withdrawals of $25,000 or $100,000 as advances against future profits of the Morristown branch. Gateway officer's Bruno Pasceri and David Walbrandt both testified that the respondents agreed to repay their salary and profit sharing advances.[7] Petitioners maintain that respondents were expected to repay the money it allowed them to withdraw in good faith.

Respondents claim that by making them re-pay the deficiencies, Ms. Brogan was enforcing an illegal contract and one that was in violation of public policy. This argument was raised after Ms. Brogan entered her interim award so she refused to consider it. Respondents contend that HUD requires that licensed mortgage lender must pay all expenses and can offset the expenses against commissions owed, but cannot make loan officers responsible to pay such expenses personally. Therefore, respondents argue

---

[7] Respondents never challenged the accuracy of the number or claimed not to have received the advances. Further, they did not attempt to refute the testimony of Gateway officers at the hearing.

that making Field and Witzburg personally liable for the loans was illegal.

Petitioners insist that respondents are not being held personally liable for the net branch expenses, but rather for the over $800,000 in cash advances that they personally withdrew against anticipated future commissions, and which they expressly promised to repay.  This is the first time that the respondents have raised this argument and it is not based on any new facts or change in law so petitioners claim that the argument is procedurally improper.

Finally, respondents contend that Ms. Brogan improperly found them joint and severally liable for over $800,000 in advances they withdrew from Gateway.  As a counterclaimant against each defendant for the alleged P&L deficiency and alleged customer diversion, Gateway had the burden of proof on each claim against each individual.  However, they claim that Ms. Brogan treated the two individuals as "one" because they were jointly represented, which resulted in Mr. Witzburg improperly being held responsible for additional expenses.

Respondents never raised this argument before or during the arbitration.  As a result, the arbitrator concluded that since the respondents acted jointly and referred to both individuals as one entity throughout the arbitration, it is too late disclaim joint liability post award.  Petitioners believe that this does not provide a basis to vacate the arbitrator's determination that the respondents are jointly and severally responsible for the advances that they withdrew and agreed to repay.

II.    **LEGAL STANDARD**

Section 9 of the Federal Arbitration Act (FAA) states that the court must grant an

order confirming an arbitration award unless the award is vacated, modified, or corrected

as prescribed in Sections 10 and 11 of this title.  9 U.S.C.A. § 9.  The review of an

arbitration award is "extremely deferential" and vacatur is appropriate only in

"exceedingly narrow" circumstances.  Dluhos v. Strasberg, 321 F. 3d 365, 370 (3d Cir.

2003).

An arbitration award may be set aside where there is an adequate showing of

fraud, partiality, misconduct, violation of a specific command of law, or showing that

enforcement would be contrary to public policy.  Teamsters Local 312 v. Matlack, Inc.,

118 F. 3d 985, 995 (3d Cir 1997); see also 9 U.S.C.A. § 10[8].  The court's ability to vacate

an arbitration award is almost exclusively limited to these grounds, although an award

found to be in manifest disregard of the law can also be vacated by the court.  United

Transportation Union v. Suburban Transit Corp., 51 F. 3d 376, 380 (3d Cir. 1995).

_____

[8] (a) In any of the following cases the United States court in and for the district wherein the
award was made may make an order vacating the award upon the application of any party to the
arbitration -
    (1) Where the award was procured by corruption, fraud, or undue means
    (2) Where there was evident partiality or corruption in the arbitrators, or either of them
    (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing,
    upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the
    controversy; or any other misbehavior by which the rights of any party have been
    prejudiced.
    (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a
    mutual, final, and definite award upon the subject matter submitted was not made.
(b) Where an award is vacated and the time within which the agreement required the award to be
made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

In addition, procedural irregularities may result in such fundamental unfairness as to warrant the vacation of an arbitral award.  ***Teamsters Local 312***.  For example, the court vacated an arbitration award where an arbitrator received ex parte information to the prejudice of one of the parties.  Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co., Ltd., 868 F.2d 52, 56-57 (3d Cir. 1989).  See Harvey Aluminum v. United Steelworkers of America, 263 F. Supp. 488 (C.D. Cal. 1967) (vacating arbitration award where the arbitrator refused to admit certain evidence in rebuttal without giving parties warning about the application of evidentiary rules); International Bhd. Of Elec Workers, Local Union 1823 v. WGN of Colorodo, Inc., 615 F.Supp. 64, 67-68 (D. Colo. 1985)(vacating arbitration award and remanding because the neutral arbitrator rendered decision without obtaining the signatures of the partisan arbitrators, so that there was a lack of evidence of any significant decision-making process by the majority of the board). The net result of a court's application of this standard is generally to affirm easily the arbitration award under this extremely deferential standard - a result that is squarely in line with the purpose behind the FAA [Federal Arbitration Act] where courts are tasked with reviewing an arbitration decision.  Dluhos, 321 F. 3d at 370.

When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, fact-finding" does not provide a basis for a reviewing court to refuse to enforce the award. United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 39 (1987).  In discussing the courts'

limited role in reviewing the merits of arbitration awards, we have stated that "'courts ... have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim.' " Id. at 37 (quoting Steelworkers v. American Mfg. Co., 363 U.S. 564, 568 (1960)). When the judiciary does so, "it usurps a function which ... is entrusted to the arbitration tribunal." Steelworkers v. American Mfg. Co., 363 U.S. 564, 569 (1960).

## III.   DISCUSSION

There is no basis to vacate the arbitration award.  The respondents have not overcome the exceedingly deferential standard necessary to vacate, modify or amend an arbitration award.  The record does not indicate that the arbitration was procured by corruption or that the arbitrator was partial, guilty of misconduct in refusing to hear evidence material to the controversy or any other misbehavior by which the rights of any party have been prejudiced.  9 U.S.C.A. § 9.

Respondents claim that Ms. Brogan incorrectly found that the contract between Gateway and Fields and Witzburg was implemented by Sicilia entirely on her own without credible evidence that senior management knew about or gave any advice on how to implement the loan pricing provision.  They are seeking to vacate the arbitration award claiming that respondents withheld material documents which showed that senior management was aware of the loan pricing provisions implemented by Sicilia and that by failing to consider these documents the arbitrator's award was prejudiced.

These documents were subpoenaed after Mr. Orzechowicz's testimony indicated the existence of relevant documents.  Ms. Brogan included these documents in evidence and considered argument on them in the parties post-hearing briefs.  It is clear that Ms. Brogan did not ignore the meeting documents or fail to consider them.  She carefully reviewed them and concluded that the documents were "far from a smoke and gun" and were not evidence of fraud, conspiracy or any RICO violations.

Ms. Brogan directly addressed the meeting documents in her Interim Opinion and Award dated November 1, 2006.  The Market Overview document merely stated the course of conduct which the branch followed.  It specifically stated that Field/Witzburg received Conventional/Government loans at .500 (.375 additional on government) and .375 on Jumbo loans.  This was simply another reiteration of how the parties implemented the Net Branch Agreement.  This information was not new evidence and was located in other parts of the record.  The second relevant document was the Agenda item that indicated that Sicilia discussed pricing margins at the meeting.  There is no evidence that Sicilia spoke about Field/Witzburg loans or any other matter concerning the Morristown branch at that time.  As Ms. Brogan points out, there was not one witness who confirmed that the pricing of the loans originated by the Morristown branch was ever specifically discussed in Board meetings.  She concluded that "[e]ven if such a document was given out at every single Board meeting, this meager evidence simply does not demonstrate fraud or a conspiracy to defraud the [respondents], as alleged, nor does it prove a

-18-

violation of either state or federal racketeering statutes." (Interim Award at 41).

Mr. Orzechowicz testified under oath and signed two Affidavits swearing that he had shown these same documents to counsel months before the arbitration.  Counsel did not request these documents. If they believed these documents were tantamount to their success, then they could have subpoenaed them, questioned Mr. Orzechowicz and cross-examined Gateway's witnesses regarding their contents.  Furthermore, Ms. Brogan specifically advised the parties that she would "reopen the record for testimony for good cause shown." (Letter from Ms. Brogan, May 19, 2006).  This was yet another opportunity for respondent's to use the "secretly withheld" documents to prove their case. However, and again, instead of using this opportunity to further examine or cross-examine witnesses regarding these "essential" documents, the respondents stipulated to close the record.  In fact, respondents specifically stated that they had "no further evidence, proceedings, or offers of proof."  (Respondent's letter to Ms. Brogan, May 19, 2006).

Ms. Brogan thoroughly reviewed and properly handled Mr. Orzechowicz's withheld documents.  There was no indication that these documents resulted in a corrupt or fraudulent arbitration award.  The manner in which Ms. Brogan handled these "withheld" documents was certainly not evident of partiality or corruption or any other misbehavior by which the rights of any party have been prejudiced.  Furthermore, the consideration given to these documents and the manner in which they were presented

-19-

certainly did not result in a manifest disregard for the law.  These grounds are grossly insufficient to vacate the arbitration award.

Respondents claim that Ms. Brogan was a partial arbitrator and favored the petitioners.  After thoroughly reviewing the record and the extremely limited support for this notion presented by respondents, it is evident that Ms. Brogan's actions appeared reasonable and just.  The resulting award was not procured by corruption, wrought with misconduct or inappropriate in a manner which would prejudice the parties.

Next, respondents contend that Ms. Brogan did not follow the clear and unambiguous contract by forcing respondents to re-pay the alleged unsigned P&L deficiencies.  This exact argument was presented to the arbitrator at the hearing and after weighing all the evidence and the parties course of conduct, Ms. Brogan concluded that respondents had to repay the money to Gateway.  Respondent's further claim that by doing so Ms. Brogan is enforcing an illegal contract and one that it is violation of public policy.  This is the same contract that the respondents originally sued Gateway for allegedly not honoring.  They now claim that contract is illegal because HUD requires that the licensed mortgage lender must pay all expenses and can offset the expenses against commissions owed, but cannot make loan officers responsible to pay such expenses personally.  However, Ms. Brogan insisted that the monies must be repaid as a result of the parties prior course of conduct.  Thus, the respondents are not being held personally liable for branch expenses, but rather, as they had done throughout the contract

period, are responsible for the monies which they personally withdrew against anticipated commissions.  The HUD regulations are not directly on point.

Finally, respondents assert that Ms. Brogan improperly found them jointly and severally liable for over $800,000 in advances which they withdrew from the Morristown branch.  The respondents tried this case as one unit represented by one attorney with a unified approach.  It was not until after the Interim Award that the respondents even raised this argument and Ms. Brogan denied[9] this request in her Final Opinion.

It is inappropriate for this Court to review the arbitrator's contract interpretation since her determination is entitled to the highest deference and this Court has "no business weighing the merits of the grievance."  Garvey, 532 U.S. at 509-510.  Ms. Brogan's contract interpretation and resulting awards were based upon seven days of hearings and thousands of pages of documents.  She had the ability to interpret, understand and weigh all of the evidence as well as make credibility determinations throughout this dispute.  The Arbitration Award was the result of a thorough discovery process, lengthy hearings and a detailed interpretation and analysis of the facts and appropriate law.  Ms. Brogan certainly did not conduct an "improvident, even silly, fact-

---

[9] After the Interim Award issued, the [respondents] raised, for the first time, the issue of the apportionment of liability, arguing that Mr. Field and Mr. Witzburg may have had differing obligations and/or defenses with respect to the contract breaches found in the Interim Award.  This issue was not raised in the merits phase of the proceeding, nor, for that matter, did the [respondents] argue that they may have been entitled to different remedies for alleged claims.  The [respondents] appeared in this forum united in representation by counsel, and united in their claims and their defenses to the counterclaims.  It is simply too late to take a different approach now, as it would require me to reconsider the merits of the disputes... (Final Opinion p.7).

finding" process and even if she had, it would not provide a basis for this court to refuse to enforce the award.  <u>Misco</u>, 484 U.S. at 39.  There is no evidence of impartiality, corruption, misconduct or any other misbehavior detailed in 9 U.S.C.A. § 9 necessary to vacate an arbitration award.  After carefully and thoroughly reviewing the record, there is no basis to vacate the Arbitration Award.

IV.   **CONCLUSION**

For the reasons stated above, I confirm the Arbitration Award.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GATEWAY FUNDING | : | CIVIL ACTION |
| DIVERSIFIED MORTGAGE | : | |
| SERVICES, L.P., et al., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 04-4428 |
| | : | |
| JOHN FIELD and | : | |
| MARTY WITZBURG. | : | |
| Defendants. | : | |

## O R D E R

STENGEL, J.

    **AND NOW**, this 10th day of July, 2008, upon consideration of plaintiff's Motion to Confirm Arbitration Award (Document #8), defendant's Response in Opposition to Motion to Confirm Arbitration Award (Document #11) and all responses thereto, it is hereby **ORDERED** that the motion is **GRANTED**.

    The Clerk of Court is directed to mark this case closed for statistical purposes.

BY THE COURT:


/s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.